VINCENT v. ATI Holdings LLC VINCENT v. ATI Holdings LLC and EEOC versus ATI Holdings LLC 23-12417. And I see that Ms. Wilkinson and Ms. Patel, you're going to be sharing time. You'll see we're running on a stopwatch system. And so you should be monitoring that. Obviously, when you get down to two minutes, you're starting to get pretty close. And when you reach the end of that time, indicated, I'll let you finish your thought, but don't move on to another topic entirely. And with that, Ms. Wilkinson, when you are ready, please proceed. Thank you, Your Honors. Good morning, and may it please the Court. I, along with Rick Bearden, represent Emily Vincent, who is the plaintiff's appellant in this employment case. And the two primary errors, drew factual inferences against my client and in favor of ATI, and that's impermissible at the summary judgment standard, and overemphasized McDonnell Douglas. And for these reasons, reversal is required. So what would the evidence show when all inferences were drawn in favor of the non-moving party, Ms. Vincent? Well, it would show that Ms. Vincent was a three-year employee at Pinson Valley High School. She had no discipline, no issues, no record of any performance issues. The only thing that changed about Ms. Vincent's employment was that Pinson Valley High School hired a brand new football coach, Coach Shea. And Coach Shea made the comment that he wasn't comfortable having a woman working around his football field. So my notes say that Vincent says, that Sheppard says, that Shea said that he was uncomfortable working with a woman. And I haven't found, so I read Sheppard's deposition, and he doesn't testify to that there. So this looks like double hearsay to me, and I'm having a difficult time figuring out how we should even be considering this. Well, the other testimony is there is a text message between Mr. Sheppard, Coach Sheppard, and Ms. Vincent, where Coach Sheppard says all this because they wanted a man. Now, he admits sending that text message. So I think when you look at all the evidence, Your Honor. So just to be clear, you have no response to the double hearsay problem on the statement about, because maybe there is one, I just don't know what it is. Well, I think it's admissible, Your Honor. I mean, I think when she's told by a coach that's heard him say this, I think it's a credibility issue. Ms. Vincent's going to say, I was told that this brand new coach worked around me, around, not around a lot, but around me for a 15 days. I'm an excellent employee. I'm doing an excellent job. And I leave this meeting, and this coach says, oh, that makes sense because he made the comment he doesn't want women working around his football program. Well, when you look at the rest of the evidence of all of this, Ms. Vincent's replaced by a man. She's removed from Pinson Valley High School for no reason. There is no justifiable reason other than the fact that Coach Shade didn't want a woman working with his football program. All right. So the text message from Shepard to Vincent, does it say anything? So I guess I'm trying to figure out how do we get this to Shade? Because Shepard is not saying, I didn't want to work with a woman. He's saying, it's my assessment that these other people didn't want to work with a woman. And I'm just trying to figure out how that, like, how does that come in? How is that evidence? How is me, like, for example, if I were to look at this record and say, it's my assessment that Shade doesn't want to work with a woman, how does my assessment of it come in? Like, how is that evidence of anything? Well, I think it's a statement against interest. I mean, I think when you look at that text message, Shade tried to deny it in his position. But I think when you look at the totality of the evidence in that text, I'm sorry, Shepard, thank you, Your Honor. I think that when Mr. Shepard and Ms. Vincent are exchanging these text messages and Mr. Coach Shepard admits all this because they wanted a man, that's what he understood that environment was under Coach Shade at Pensacola Valley High School. That was the expectation. And when you look at the fact that Mr. Paquette testified when he was asked, what did you do, ATI? What did you do, Mr. Paquette, to protect Ms. Vincent from discrimination? He testified, we removed her from Pensacola Valley. So they knew. What about the fact, going back to this text exchange, it actually starts with your client saying, without evidence for my dismissal and for me to be replaced with a man. And then Shepard says, so all this because they wanted a man. It's a little bit different. The way the text actually reads is a little bit different than what you're saying, that he said, oh, this is because they wanted a man. He seems to be following her lead. What about that? Well, but I think that what she understood from their previous verbal conversation and then this text exchange, Ms. Vincent makes it very clear in her testimony that that's what Coach Shepard reported to her. And then she has this text exchange and he says, all this because they wanted a man. Now, by the time I deposed Coach Turner, excuse me, Coach Shepard, he had been rehired by Pinson Valley and was working again at Pinson Valley as an assistant coach. So I think credibility is a big issue here. Okay. Can you ask, so the position that I think you're taking is the one that the EEOC takes, which is that the rule here should be that ATI is liable if it knew or should have known of the discrimination. Is that- Correct. Okay. What is the, so let's just assume that these text messages or something here reflects discrimination on the part of Pinson Valley in wanting to replace your client with a man. Where is the connection with ATI? So ATI had, first of all, had control over Ms. Vincent under their contract with Pinson was no documentation anywhere to show that Ms. Vincent had any performance issues. The very first time that ATI saw anything was on June 8th of 2020 when Principal Turner sent his memo. That's the first and only documentation. And ATI admits that it lacks specificity in that memo. Had they asked her supervisor, because here's what Ms. Vincent's supervisor knew, is that there were no complaints about Ms. Vincent that were valid. There had been one complaint by another athletic trainer and it was a miscommunication. And Mr. Bush, her supervisor, said Ms. Vincent did nothing wrong. They never showed Ms. Vincent Coach Turner's memo. They never talked to her about specifically what was in it. And she repeatedly asked for a copy. And then they replaced her with a man. Now ATI wants to say no, they replaced her with a female. But her supervisor, Mr. Bush, was very clear about it. He told Coach Shea, you're going to have a new athletic trainer and that athletic trainer is going to be Alex G. Three coaches working at Pinson Valley High School, Coach Lee, Coach Brazil, and Coach Shepard, all testified that Alex G replaced Ms. Vincent. Let me ask you a question. Assuming that there was no overlay, I know you've made the accusation of discrimination. Let's just pretend for the sake of argument, we've got a coach. ATI has provided somebody to be working with the school. The school does not have to provide a reason why the school no longer wants the trainer there. It could simply be, I don't like the person's attitude. Or there's a personality conflict, we have a new coach. If there's no discrimination, there's nothing that would prohibit. And in fact, the contract specifically says that ATI would designate athletic trainers to work at school with the approval of the school, correct? I understand that, Your Honor, but here's what happened after she was removed. When Ms. Vincent reports to ATI that I've been removed and I think this is gender discrimination, Mr. Paquette and Ms. Erickson, who is HR for ATI, emailed back and forth between each other, Doc 6526 at two, and they're saying, here's what we're going to tell Ms. Vincent. We're going to tell Ms. Vincent that obviously, we're going to investigate this and look into these issues. She can go home on pay while we're investigating these issues. They never investigated the issues and then came back with her- Counsel, let me ask you this. I'm sorry, but- Oh, that's fine, Your Honor. As I hear you in the EEOC, your position is that ATI had an obligation to basically litigate the issue of discrimination on behalf of- I don't think that has anything- I'm sorry, Your Honor. As to whether Pinson Valley is guilty or not. I mean, it sounds to me like, suppose they look into it and they say, well, it's a swearing match. What are they supposed to do then? I don't think it's a swearing match because- No, I didn't ask you that, Counsel. I asked you- I'm sorry. You're asking us to take a position that ATI had an obligation to determine whether there was discrimination here or not. And suppose they look into it and it's a swearing match. Are they to impanel three of their employees or three of their officers and hear testimony? Are they to apply the McDonnell Douglas test, the mosaic approach? Is there shifting of burdens before them? Suppose they look at it and say, it's a swearing match. Don't tell me you don't think it was a swearing match. I'm asking you about what will happen if we adopt your position. Suppose they look at it and they think it's a swearing match. What are they then to do? I think they are then to look at Ms. Pinson's history with employment. But even if they say, absolutely, it's a swearing match, it's what they did after that, Your Honor, that is absolutely critical. When they offer her adverse positions, one paying less and one where she has to drive an hour and a half. You're shifting the argument there. If we're to hold ATI responsible for any discrimination that Pinson Valley does, if ATI goes along and removes the person or send somebody else, I don't understand exactly what ATI is supposed to do other than impanel in many court to decide the issue themselves. And I think that's a position way too far. I don't think they have to do that, Your Honor, because I think when Paquette testified, we moved her to protect her. I'm sorry, counsel, you're not listening to me. Take yourself out of this case. You're asking us to adopt a rule that an employer in the position of ATI has the obligation to determine whether the people to whom it sent employee, and those are loaded terms in this context, was discriminated against or not. And I'm not talking about Paquette. I'm not talking about Vincent. I'm not talking about the coaches. I'm talking about what happens if we adopt your position as the law of the circuit. And we have one of these cases in which it's a swearing match. And don't tell me, well, in this case, there was discrimination. You're avoiding the question. The question is, how is a party, an entity in the position of ATI supposed to determine that if there are competing inferences both ways? Well, I think they have to look at the evidence, Your Honor. I think they have to make a determination and then we review them. I think they have to make a determination. If they disagree with their, and we disagree with their determination, they're liable. Well, I think you have to look at what they did or did not do. And I think you have to look at the fact that Paquette provided false information to Ms. Erickson. Counsel, you keep wanting to argue this case about whether there was discrimination. And I'm asking you whether you should be arguing this case in front of ATI if we adopt your position. Because I don't see what a supplier, let's call it a supplier, a personnel like ATI is to do in this situation, particularly if they've got a contract obligation to follow the wishes of the entity to whom they supply it. Now, I know you can say, well, the Title VII overrides that obligation. But my concern is with the internal decision or the decision within your framework, and how they would make it. And I guess then if Ms. Vinson disagrees with their decision, there's no appeal within ATI. So, she would just charge them with discrimination, even though they weren't the discriminator. That's your position, right? No, sir. I think they, both ATI and Pennsylvania discriminated against her. I think that it was both of them. And I think that they all- How did ATI discriminate? Is there any indication that they would have taken a different position had this been a male? The male says- I think that's- Go ahead. No, I'm sorry, Your Honor. Go ahead. Well, the male comes in and says, they got rid of me because this DEI position they've adopted. And that's discrimination. Is there any indication that ATI would have said, that's up to the school, we've got a contract, that they wouldn't- I know, Your Honor, because I think they had a duty to look into that and investigate that, and they didn't do that here. And I think when they call Ms. Vinson's complaints toxic, they allege she had ongoing issues knowing she did not, knowing that statement is false, and then admitting that they removed her to protect her. Your response to everything is to say that there was discrimination in this case. I'm asking you about the problems with the model you would have us adopt. I believe- I'm sorry, Your Honor. No, you go ahead. No, I'm sorry. I believe ATI had a duty and an obligation to determine whether or not Ms. Vinson had been discriminated against when she raised those issues to them. And then what they did after is both discriminatory and retaliatory. Let me ask you this. Suppose they said, it's close, but we think she's been discriminated against. And Pinson Valley says, you can think what you want to, we're not taking her. What should they do then? What happens then? Then they should move her to a job where she's getting the same amount of pay, and there were available positions very close by to her, but they should not have offered her only the jobs that decreased her pay by 19%. Suppose there were no other jobs. And don't tell me there were. Just tell me what happens if there were no other vacancies anywhere around her that didn't involve a three-hour round-trip commute or a cut in pay. Well, I think Mr. Paquette said it best. He was asked, what happens if Pinson Valley says, we don't want a black working with our football team? And Mr. Paquette said, oh, no, no, no, no. We would tell them that's not how ATI does business. And we want the most qualified person in the position. And then the school says- So I think that answers your question. No, no, it doesn't. Because then the school says no. What happens then? Well, I think that then they could say, well, she's our best qualified candidate. Please leave her there or fine, we'll move her. But we're going to give her a comparable job with no adverse treatment. And we're not going to replace her with a man, which is exactly what they did. Let me ask you a question. You have pointed to the jobs that were offered to her and said, one was lower pay, one had a 90 minute one way commute. Is there any evidence in the record? And I will tell you, we were unable to find it about what her commute time was to PVHS. Oh, it was minutes. She grew up in that area. Is there any evidence in the record of what her commute time was? No, Your Honor, not that I'm aware of. But there were several other positions that were very close to Benson Valley High School. There was a job... No, that's not the question I'm asking though. You're pointing to the 90 minute one way commute as an adverse employment action, which means you're saying because it was how much longer than the commute to PVHS. And I'm just asking you whether her commute time is in the record. Not that I'm aware of, Your Honor. Okay. All right. We've obviously gone past, but you do still have two minutes for rebuttal. Ms. Patel, you have five minutes. You're still on mute. Good morning, and may it please the court. Tara Patel for the EEOC. Viewing the facts in Ms. Benson's favor, a reasonable jury could find that ATI's removal and transfer of Ms. Benson each violate Title VII's anti-discrimination and anti-retaliation provisions. I first want to address the standard of control. ATI could be liable because under this court's holding in Yampias, a jury could find that ATI had a degree of control over the removal decision. And importantly, here we look at what ATI could have done and its responsibilities under Title VII not to discriminate as to the terms and conditions for which it had control over. And here there's evidence in the record that ATI did have control over the removal decision. It could have investigated the discrimination. It could have alerted Pinson Valley of the discriminatory nature of the request. What is the evidence in the record that ATI had the final say on this? To be clear, the question is whether there was a degree of control. And here there is evidence from emails with Pinson Valley requesting ATI grant the request. There's also a history of that happening with Blackman as well with, again, an email with requesting that ATI grant the request and sending over supporting documentation for that request. What happens, counsel? What happens to degree of control? You know, degree is a spectrum, 1 percent, 100 percent. Suppose ATI says, this looks bad to us. Please reconsider. Can Vegas say we reconsider? No. And ATI says, we really, really, really wish you'd reconsider. And ATI says, no, no, no. What happens then? Ultimately, that's a, the, whether ATI took corrective measures within its control is a question for the jury. And if it had said, we investigated this, we couldn't find any. No, no, counsel, counsel, counsel. You, just like your predecessor, you're arguing, predecessor's an argument today. You're arguing the facts. I'm asking you, if we adopt your position, what happens then? In a case in which ATI says, you can't do this, and the school says, watch us, we're not taking, what happens then? In that case, ATI would have discharged its liability, and it would not be responsible because it had already taken measures within its control. So, there is, this provides helpful guidance to employers that if. Who would be responsible for the violation of Title VII if there was one, when ATI did everything it could and couldn't remedy it? If ATI did everything that a potential appropriate defendant would be the school in that case, but ATI would have taken measures within its control with respect to the terms and. That's what I don't understand. Everybody says the school's a bad guy, or at least you say the school, hypothetically here at least, allegedly was the bad guy. And ATI is responsible only because it didn't keep the bad guy from doing bad things. Well, why is the school, Pinson Valley, not a defendant to start with? Why does it not face potential liability, particularly since it has more access to the evidence than ATI would? As an initial matter, the school, I believe, was a defendant, but I want to explain why ATI is liable. It has an independent obligation under Title VII not to discriminate. You may want to explain that, but I want an answer to my question. Why is the school not, why does the school not follow the potential liability as far as ATI did? In other words, why is ATI not before us? It is the answer to Judge Karn's question that the school was a defendant and the school entered a settlement with the plaintiff? Correct. Can I ask you a question? So, you say in your brief that the standard is that, you say this, that a reasonable jury could find that ATI knew PVHS's removal request was discriminatory, yet acceded to it and took no corrective action. What's the evidence that a reasonable jury could use to find that ATI knew that the request was discriminatory? Yes, Your Honor. First, there's Piquette's own testimony where he said that Ms. Vincent told him that the remarks by Shade, that Shade said he didn't want to work with a woman. Piquette also knew that there was a period of just a couple of days where, between when those remarks... So, who knew about the not working with women comment? What was that? Yes, Your Honor. There's evidence that Piquette testified that Ms. Vincent told him about the discriminatory comments from Shade. He also knows that those, and he also knows that those discriminatory comments were made mere days before Ms. Vincent was let go or when PVHS submitted this request. He also knows that this follows on the heels of a strong performance from Ms. Vincent. Again, this is supplemental evidence. He also knows that in Mr. Blackman's case, ATI sent over a slew of documentation that wasn't the case for Ms. Vincent. And most importantly, he knows that he testified that he knew about the discriminatory remarks. And when pressed about Ms. Vincent's removal, Turner himself could not back up any of those statements and Piquette testified that he never asked Mr. Turner about them. But again, most importantly, Piquette himself testified that Ms. Vincent told him about this discriminatory comments and the temporal proximity between those comments and the removal are just a couple of days. And for that proposition, I'd like to direct the court to- Let me just ask you one question about the comments. I guess you heard my question to the plaintiff's counsel about that. So, as I understand it, this comment is Vincent says that Shepard says that Shade said that he didn't want to work with women. And it's just in my mind, I'm just trying to figure out how any of that is a thing that anyone should care about. Well, at summary judgment, federal rule of Civil Procedure 56 allows for the submission of hearsay evidence. If the plaintiff can proffer, it will be provided in admissible form at trial. I guess there's two questions on that. One, I agree that that's the rule. I'm still trying to... I asked the plaintiff and she didn't have any theory for how this would come in from what I could tell. And so you might, but I guess the other one is you relied on that comment to say, well, look, ATI knew about that comment and ATI knew about it the same way we did, which is that the plaintiff told ATI that she had heard from Shepard that Shade had told someone that he did not want to work with women. And I guess, so this is kind of a two-part question. One, do you have any theory for how that might come in? And then like, is that really the kind of thing that puts someone in ATI's position on sort of notice that, I mean, certainly the plaintiff is complaining that she thinks she was discriminated against, right? But how does that work? So to answer your second question first, and then your first, how would ATI know? Ms. Vincent told him, and that would trigger an obligation for ATI to take corrective measures within its control because again, it has an independent obligation not to discriminate as to the shared terms and conditions of employment. So again, this is looking at ATI's discrimination. And if it didn't take those measures, it itself would be discriminating as to the terms and conditions of employment. This is not automatic liability. And as to the first question, Ms. Vincent could call Coach Shepard to the stand to testify as to what he knew. Ms. Vincent could also admit the text messages. Again, I think there's a jury could find based on those text messages that Coach Shepard was talking about the reasons for her removal. There could be another inference from those text messages, but it says all this happened because she was a man. And that's enough for a jury to find that the removal was based on the fact that Ms. Vincent was a woman. What about the fact that Ms. Vincent was very clear that she told Paquette about Shade's comment after the school had told her to leave, after she had been removed from the school? I have two responses to that. First, a jury could find that it doesn't matter precisely what day she told him if it's within that timeframe where ATI could have acted. And it could have acted June 5th, June 6th, June 7th, June 8th. It could have taken measures to reject the request or to investigate the request or to alert Pinson Valley that this is discriminatory conduct and we don't want to put our employees in a position where they're being unlawfully discriminated against. It could have taken those decisions at any time. So importantly, the steps for removal could have placed after June 5th. But even if we look at June 5th itself and what happened, Ms. Vincent testifies that she told Paquette at ATI about the discriminatory comments before Shade entered the office. And again, that's June 5th when she was escorted off their premises. There's also Paquette's testimony that also aligns with that. There's also contemporaneous email evidence with Paquette emailing in the morning of June 5th, emailing Principal Turner and saying, we have to discuss Ms. Vincent. No evidence has been offered for why he initiated that email. The only evidence that has been offered is the fact that Ms. Vincent told him about the discriminatory comments. So there's certainly enough for a jury to find that the comments happened or Ms. Vincent told Paquette on June 5th. But even if she told him on June 5th night or June 6th morning or June 7th morning, ATI still could have taken corrective measures within its control. And again, under Virgo, an individual can have more than one and those entities can share control over the essential terms of conditions of employment. And given the text of Title VII, they're each obligated not to discriminate as to those terms and conditions of employment. Let me ask you this, counsel, just so I'm clear. There's something you said that made me wonder. On the chain of hearsay, Coach Shade was deposed, was he not? I believe that's right. All right. Well, in any event, he denied under oath having made that statement either by affidavit or deposition, correct? And Coach Shepard denied under oath having made the statement to Ms. Vincent, correct? That he had heard Coach Shade. I need to double check precisely what he said on that issue. I or something along those lines, but I take your point. All right. But my point is in Jones, the ground freight, UPS ground freight, we said that hearsay is not admissible in summary judgment because the declarant had given sworn testimony during the course of discovery that contradicts the hearsay statement. And as such, we may not consider it in summary judgment. That looks to me like a precedent against your position. I would need to take a closer look at that precedent. But I am assuming in that case, they didn't also have a contemporaneous text message that said all this because of a man and declarant at deposition testifying that those are his text messages. So I think... But that station and that statement or the text is at least ambiguous. I mean, he could have been recounting her position. You know, oftentimes when you question myself, so just because this, even if just because this is an assumed or alleged premise. I think that there could be another take on those text messages. But again, that would be a question for a jury. And certainly, there's enough here where we have a text message saying all this because of a man combined with a history of Ms. Vincent making that complaint at that time. Again, this is not an ex post facto complaint. At that time, she told Piquette and Piquette also testified that Ms. Vincent did tell him this at that time. So it's, I think when you take... Can I ask you one more question about this, about ATI's knowledge? So it looks like, and I just want to make sure I understand your argument. It looks like your position is that because Vincent sort of complained to ATI that she thought she was being discriminated against on the basis of sex, that that was sufficient to put ATI on notice to do some kind of investigation into that. Is that your position? Yes, Your Honor. It's that fact combined with the temporal proximity between her complaint and the removal. It just happened within a couple of days. And I would point this court to Quigg, which found that statements by board members claiming that they preferred men in a superintendent role made shortly before... That's a different issue, I guess, is it seems like, I mean, because ATI didn't hear the statements. I mean, what you're saying is that ATI had a statement by Vincent that she thought she was discriminated against, and that triggered some obligation on them to do something. I mean, I think that's your position. Because if there were evidence that ATI, that the shade guy picked up the phone and called ATI and said, don't send me more women, I don't like women. I think it'd be in a whole different world if that were the evidence. But instead, it looks like the evidence is just Vincent complained to ATI that she thought she was being discriminated against. And you said that's enough. Yes, Your Honor. I think that's enough here, certainly for a jury. But when an employee comes to you and tells you that a coach said he doesn't want to work with women, and three days later, she gets fired despite having a strong history of performance at ATI. And again, a huge contrast between Berner submitting extremely specific evidence for Blackman for why he should be removed. Again, pages of reasons for safety, and in comparison for Vincent, nothing, nothing specific. You take that all in combination, and there's enough here for a jury to find that ATI knew the termination was discriminatory. But again, the most important one is that Ms. Vinson came and told him. Let me ask you this, counsel. Suppose we have, suppose an employer or supplier, let's call them a supplier-employer, does an investigation. They hear that, and they hear all the evidence, the text message and all this. And they reach a position that, no, we don't think there was a discrimination here. We've resolved the conflicting inferences and credibility questions. We don't think there was. So, we're going to supply a new assistant coach. And the plaintiff disagrees. So, what's the, what, does that automatically get the plaintiff to a jury trial if there's a genuine issue of material fact? In other words, suppose there's a genuine issue, and ATI decides that genuine issue against the plaintiff. What's the review on that? Is it plain error? Preponderance of the evidence? Shocking to the conscience? Where are we? What? I don't understand what the employer-supplier, we'll call them, supplier-employer is supposed to do in this situation and what we're supposed to do after it's tried to do what you say it's supposed to do. Yes, Your Honor. If the facts are undisputed that they took, that they investigated and found no discrimination, then they would probably win at summary judgment. Because at that point, they would have discharged their own liability as to what it could have done in terms of the measures that it could have taken within its own control as to not discriminating to, as to the removal. So, at that point, if the facts are undisputed that they investigated. Those aren't all the measures it could have taken. It could have decided because there's some evidence that there was discrimination. And I wonder if the model you're advocating wouldn't end up meaning that. In other words, they take position, they take position, measure. And a plaintiff comes in and says, no, that doesn't insulate them from liability because it was unreasonable for them to determine this person was lying as opposed to this person. And they didn't give enough weight to the text messages and so forth and so on. I just, it just seems like you're asking us to add another layer of litigation. And then de novo litigation about the litigation and whether it was, and that concerns me. But let me back up and clarify that, again, we're only looking at what ATI could have done with respect to the terms and conditions of Ms. Vincent's employment that it had control over. So, we would focus the inquiry there. So, it wouldn't be these two steps of litigation. And if it's undisputed that they took measures within that control, that might be enough to win at summary judgment. If there's a dispute of fact, that might be enough to carry forward. And I want to point out that this is not a novel type of standard. It actually aligns with 11th Circuit case law that holds an employer liable for the discriminatory conduct of third parties in the workplace when they fail to take corrective actions within its control. And that case is Beckford versus Department of Corrections, 605F3D951. So, this is a standard that the 11th Circuit has already employed when it comes to third party discrimination. And I also want to point this court to the reasoning that the 9th Circuit took in Global Horizons. They explained why it makes sense to adopt this standard for the joint employment liability context. They actually aligned quite well. And there's a history in the 5th Circuit, the 7th Circuit, and the 9th Circuit of adopting this standard because it does provide helpful guidance for those situations that you outlined, Judge Carnes. And there's no circuit that has found this to be an inappropriate standard. And it aligns with this court's holding in Virgo that says that entities share control over the essential terms of conditions and aligns with the text of Title VII that says that they're each obligated, there's independent obligation given the text of Title VII to not discriminate as to those terms and conditions of employment. And we know there's not automatic liability. So, we have to look at what ATI could have done not to discriminate as to the terms and conditions for where it had control. Thank you, Ms. Patel. Thank you. All right. That was a helpful answer, Ms. Patel. I appreciate it. And please forgive me if I mispronounce your last name. Please correct me if I do. Is it Ms. Annert? It's Annert, Your Honor. Ms. Annert, you have 15 minutes. Thank you. May it please the Court, I am Janelle Annert and I represent the appellate ATI in this case. I want to jump right into the discussion on control that the Court has been having thus far. I think it's quite telling that Ms. Vincent did not argue lapinus in her brief to this Court and instead is relying on EEOC guidance with regard to the same. You know, under that 11th Circuit case law, as we have argued, the Court must review and address what degree of control ATI had over the decision to remove Ms. Vincent. We disagree with the District Court's finding on the control argument. Why didn't it have maximum control? Why didn't it have infinite control? I don't understand because the contract that you point to is preempted by Title VII. So, this is not a situation where you have, for example, I think what was contemplated by that 11th Circuit case was that you had, you know, someone that actually didn't have any control over it, right, as a functional matter, right? They were not involved in the decisions. They didn't really have anything to do with it. But I mean, here, this agency is who gave her the paychecks. So, why isn't it absolutely 100% within that agency's control whether to continue giving her those paychecks? Yes, Your Honor. And whether or not to continue paying her is in ATI's control. But whether or not to continue her being assigned to the Pinson Valley High School is not. ATI- Why isn't it? Why isn't it? I don't understand because they could just say, look, Pinson Valley, this is your person. We're providing you this person. You don't have to hire us, right? You don't have to use our services. But if you're going to use our services, this is the person that we're providing for you. It seems like that would be what they would have to do. If Pinson Valley had said no black people are allowed on our campus, right, ATI couldn't say, oh, well, we'll just send white people. We have no control over that. They would have to under Title VII say, we're providing you this black person. You don't have to use our services if you don't want to. But we're not going to violate Title VII, right? Why isn't that in ATI's control? Yes, Your Honor. Well, and as Judge Carnes has pointed out, the two extremes, you know, one is, and as Mr. Pequette said in his deposition, if that was the case, you know, he would have asked them to reconsider. If in the end they refuse, they can terminate the contract. He cannot. Yeah, so why not do exactly the same situation here? Because that's not the situation here. Why isn't it? If this had actually been sex discrimination, I mean, I understand your arguments. I don't understand this argument. This argument seems stupid to me because if this had actually been sex discrimination, and if Pinson Valley had actually called ATI and said, send no more women. We hate women. We don't want any women here. You know, we don't even hire women attorneys, right? We hate all the women. ATI would not have said, we have no control over this. We just have to send men, right? They would have done that. Title VII says they can't do that, right? Yes, and I don't disagree at all with your argument. So they have control. It's not whether or not they have any control. It's what degree of control over this particular decision. Didn't you just say they have 100 percent control because they can determine, if we're going to be in this contract, here's the employee that we are offering you, right? But what Ms. Benson is arguing is they could have kept her at Pinson Valley, and they cannot control that. What they have control over is what they do next when they must remove someone. They could have terminated their contract with Pinson Valley. They chose not to do that based on the facts of this case. But the degree of control they have is what do we do next? And that's the district court- They also could have just kept paying Ms. Benson for what they were previously paying her, right? They could have, but they- They didn't do that either. They have 100 percent control over her paycheck. Well, they would have been then paying her inconsistently with what they have established as how they pay for middle schools, high schools. So what? They have 100 percent control over it. They do, but they can't- Instead, they paid her 19 percent less. They offered her a job that paid her 19 percent less. Well, they offered her a job that paid the same, and she chose the job that paid 19 percent less. Well, you know, point being, they have 100 percent of the paycheck too. Yeah. But they would have to- I'm sorry. They'd have to- I'm sorry. You can't say with a straight face, even as an advocate, that offering her a job that required a three-hour commute is the same as the job she had. And I know if she had had a three-hour commute in this job, A, she wouldn't- She just- That's absurd. And secondly, it would be in the record because your client would have put it in the record and said, there's no difference. We offered her a three-hour commute. She has a three-hour commute round trip. It's the same. It's not the same. And I mean, you're talking about driving from Montgomery to Birmingham every day, back and forth, is the same as some normal commute, whatever that is. It's just simply not the same. I understood, Your Honor. And my response to that is, it's not in the record because Ms. Vincent didn't argue that to the district court. She only argued the difference in pay. And the district court specifically said, I'm not going to analyze, and there's no evidence in the record on how far- I know, but you forfeit issues. You don't fit forfeit arguments. And it's just plain as day to me that a three-hour commute is not the same thing. Round trip commute is not the same thing as your normal average everyday commute. I understand, Your Honor. But the duty, as I read it from, and again, these are not binding on the 11th Circuit, but the district courts that have interpreted this argument in the 11th Circuit have said that the duty ATI has is to reassign Ms. Vincent to the jobs that were available at the time of the reassignment, not to bump her up to a higher pay than what they're paying men who are doing the same job. That might be in their control to do, but that also violates Title VII. So when you choose, and when she makes the choice to go to the middle school, they've got to comply with their pay standards for middle school. They can't pay her more than a male when there hasn't been a finding that her removal was discriminatory from Pinson Valley High School. They didn't determine- Let me ask you this. What did Pinson Valley say to ATI as the justification that they get ATI for removing, for not wanting her to work there? Yes, Your Honor. There was a telephone call between Mr. Paquette and the Principal Turner, and Principal Turner testified in his deposition that the reasons that they did not want her to return, she was holding herself out as an assistant athletic director, and the school's argument was that she was never given that job. She was never assigned that job. The court determined that was a question of fact, but their position was she was holding herself out without authority when she had no such authority, and that's a reason we don't want her to come back. She was talking to the coaches and telling them they were not holding the school to the standard of the prior coaches. She was telling them they had to remove items from their office, from other schools. She was overstepping her authority as an athletic trainer, and he wrote the letter that she was creating a toxic work environment between these coaches. They did not want to continue to work with her because of how she was. When you say the letter, is that the June 8th? Is that the email? Was that the June 8th email? It's actually the letter that he wrote as his memo for the reason for not wanting her to return, that she'd created a toxic work environment. She was asserting authority that she did not have as an athletic trainer, was inserting herself in decisions that the coaches should be making, and that's what had changed. Not just that a new coach had come in, but a new coach had come in, and she decided I'm going to tell this coach how to do his job, and he did not like that, and there's nothing discriminatory about that. As Your Honor has asserted and established, this claim that Coach Sade made a comment is double hearsay. The text does not support that. It simply supports the fact that Coach Shepard agreed within a text with Ms. Vincent that all of this because they wanted a man. There's no evidence that any decision maker involved at Pennsylvania High School made that determination or communicated that determination to Ms. Vincent or communicated it to Mr. Paquette. Mr. Paquette said he determined it was he said she said that there wasn't enough evidence to establish that that statement was made, and that as a result, he was going to take the action of removing her from the school, pursue it to the school's insistence. They had already taken her key. They had already escorted her out. They made clear if she returned to the school, she would be escorted away by police. They made clear that if the school tried to return her, that she would not permitted to work there. And so, they took the next step, which is required, which is to offer the positions that were available at that time. The EEOC's counsel suggested that there was like no inquiry by ATI as to the justifications that the school had for not wanting to work with this person. Is that accurate? Or did ATI inquire of the school? Why did you not, you know, what's your justification? There wasn't a full-blown investigation, and there wasn't, you know, Mr. Paquette did not talk to witnesses at the school. He spoke directly with Principal Turner. He had a phone call with Mr. Turner. They had emails, and he asked Mr. Turner to provide a statement with regard to the reasons why she was not to be permitted back at the school, and Mr. Turner did. And that's what Mr. Paquette relied upon. Yeah. I mean, you say, you know, they didn't do a full-blown investigation, but I mean, you know, they don't have like subpoena power or whatever. I mean, so. No, no, Your Honor. And they don't have control over the coaches at the high school. Those are not, obviously, not their employees. And Turner is the principal, right? So, he's the principal of the school? Yes, Your Honor. And again, this is not removing any remedy for Ms. Vincent. Ms. Vincent did have a remedy against the school through the school system, Jefferson County Board of Education, and both Mr. Turner and Coach Shade were defendants in this matter. And so, she has a cause of action against the alleged wrongdoers, and the cause of action against those wrongdoers that she's claiming. ATIs, again, their degree of control, and I know Your Honor asserts they have 100 percent control. Yeah, I would stop arguing that if I were you, because I think your better argument is that they asked the school system, why did you want to get rid of this person? And the school system didn't say, because she's a woman, right? I think, you know, you sort of stuck yourself in this weird box where you're defending the idea that somehow they could still get rid of her, even if the school system had said, we don't have any women here, we hate women. One, that's kind of a dumb proposition, right? Because that violates Title VII. And I hope you're not giving your clients that advice that they should just... No, Your Honor. Yeah, it seems unlikely that you're telling your clients that if a client of them says, we don't want any women, that they should just not provide women to them. That seems unlikely you're giving that advice to them. But so that's not right. But actually, in this case, I mean, it looks like there's no evidence in the record that the school system communicated to ATI that they had some discriminatory reason for getting rid of Minson. That's correct, Your Honor. Their counter-argument, and I'm not saying I endorse it, would be, well, of course, they're always going to deny it. So you're saying the inquiry is what amounts to no inquiry? Well, Your Honor, again, that becomes the level of what level of inquiry then would be required under Vincent's... Exactly. And it comes to the distinction between an inquiry and a third-party, second-party investigation and determination. The concern I have, which I expressed previously ad nauseum, is where does it end when we're requiring somebody else to do an inquiry? It may be that, you know, you basically know it when you see it, or they made an inquiry, and even though a jury might not have decided that based on that inquiry the same way they did, it's okay and maybe not the best way to do it. There's not a whole lot of law on that. Yes, Your Honor, and I believe it then would create a claim for negligence, you know, whether or not the employer was negligent in investigating a claim made by an employee such as Ms. Vincent. And that opens up a whole other can of worms and a whole other line of cases that have not been recognized by this court. Ms. Vincent has argued that she was given inferior reassignment choices and that there was a June 3rd email showing that there were other high school positions available just a few days before. Why isn't it a reasonable inference from that email that contrary to ATI's position, ATI failed to offer her all available positions? Yes, Your Honor, as Mr. Paquette testified in his deposition, the availability of positions is fluid, and when they're filled, they become filled as of the day that she was provided with choices for reassignment. They provided all of the reassignments that were available at that time. And did he clarify that in that June 3rd email the other positions had been filled? Your Honor, I would have to check that level of clarity. I would have to check before I said that on the record with his deposition testimony. I know it was very clear that they pulled any and all available positions in the area to offer to her for reassignment and that those were not on the list when they pulled them when she was offered the reassignment. And I know we've seeded everybody else. If you just want to have a quick summary wrap up. Yes, Your Honor, I do think that in this case, you know, there is not evidence that ATI was provided with enough evidence to determine that the reason for Pennsylvania High School not to want Ms. Vincent on their campus as an athletic trainer was because of her gender. And so they took the appropriate step when the high school made it clear that not only did they not want her in the position, but they would not permit her to return to campus. And in doing so, they did not terminate her. They brought her back and gave her the option of reassignment that was available at the date of the reassignment. And she made the choice between which one she wanted by choosing a middle school and not a high school. It did come with a reduction in pay, but that was again to be consistent with how they were paying the middle school coaches not to take any type of adverse action against Ms. Vincent. Thank you. Ms. Wilkinson, you have two minutes. You're still on mute. Here we go. Sorry, Your Honor, I couldn't get it to click. Excuse my cough. I've had the flu and bronchitis. But the court asked a question about what is the standard to review these cases. Yesterday, Justice Thomas wrote a dissent in the denial of cert in Hiddle v. City of Stockton, California. He discussed at length the problems with McDonnell Douglas. But one of the things that Justice Thomas included in his dissent is, but a plaintiff may not establish or prove any elements by a preponderance of evidence or otherwise to survive summary judgment. At that stage, he need only offer enough evidence to create a genuine dispute of material fact, citing sell a text. So I think that clarifies or in my mind should at least explain, I think, what the standard is. But I think we've gotten confused on some of the facts. I think what is pivotal here is what ATI did after Ms. Vincent was told leave Pinson Valley High School. First thing is, when it admits we removed her from Pinson Valley to protect her from discrimination, I think that's an admission that they knew something was going on at that school, that there was a claim of gender discrimination. They offer her inferior positions. They don't offer the positions that are open. She complains that- Tell me what evidence, where is there evidence that they didn't offer her other open positions? There is a, the email you're referring to is stock 6534. That's a June 3rd email. Correct. And she was not- She was not available when they were offering her alternatives. You asked Ms. Honor if Mr. Paquette had said that those had absolutely been filled. He could not, Your Honor, in his deposition. I asked him and he just vaguely said, well, I think those may have been filled, but there was no evidence. There was no documentation that's ever been provided by ATI showing that those positions were filled at the time they only offered Ms. Pinson these two inferior positions. And there was a position, three high schools, Mountain Brook, Clay Chalk Bowl, and I think it was Jasper High School, but there were two high schools that were very close to Pinson Valley. And when I pushed Paquette for that testimony, he had no evidence to show that anybody had been put in those positions or a selection had been made. So, I think- All right. If you want to have a sentence just to wrap up, but- Yes, Your Honor. I think that when you look at all of the evidence in the light most favorably Ms. Vincent, which is what we're required to do under Rule 56, I think there's discrimination and retaliation here. And I'm, you know, well, you know, a judge, Judge Acker made a comment one time, if it looks like a duck and it walks like a duck, it's a duck, Your Honors. This is absolutely gender discrimination and retaliation on the part of ATI. And thank you so very much. Thank you all. We have your case under advisement and court is adjourned. Thank you.